772 S.E.2d 557

Michael GONZALES, Petitioner,

v.

STATE of South Carolina, Respondent.

Appellate Case No. 2011–190809.
No. 5317.

Court of Appeals of South Carolina.

Heard Dec. 8, 2014.
Decided May 13, 2015.
Rehearing Denied June 18, 2015.

480

482

Appellate Defender Susan Barber Hackett, of Columbia, for petitioner.

Attorney General Alan McCrory Wilson and Assistant Deputy Attorney General Suzanne Hollifield White, both of Columbia, for respondent.

KONDUROS, J.

In this post-conviction relief (PCR) action, Michael Gonzales argues the PCR court erred in finding trial counsel was not ineffective for continuing to represent him despite a conflict of interest. We affirm.

## FACTS/PROCEDURAL HISTORY

In June 2002, a grand jury indicted Gonzales for trafficking in methamphetamine. In July 2002, a jury convicted Gonzales of trafficking in methamphetamine, and the trial court sentenced him to thirty years' imprisonment and ordered him to pay a two-hundred-thousand-dollar fine.[1] Gonzales filed a direct appeal, and this court affirmed the sentence and conviction. *See State v. Gonzales*, 360 S.C. 263, 600 S.E.2d 122 (Ct.App.2004), *overruled by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005). The supreme court denied Gonzales's petition for a writ of certiorari.

Gonzales filed an application for PCR, alleging trial counsel had a conflict of interest because he also represented Dino Perez.[2] At the PCR hearing, trial counsel testified that in

---

1. Earlier in June 2002, a grand jury also indicted Gonzales for trafficking in marijuana. In October 2004, with different representation, Gonzales pled guilty to the trafficking in marijuana charge, and the plea court sentenced him to five years' imprisonment to run concurrently with the thirty year sentence.

2. Tara Shurling represented Gonzales in the PCR action. Gonzales's mother originally retained her to represent Gonzales in his direct appeal of the trafficking in methamphetamine charge. However, the United States Attorney's Office (USAO) approached Shurling and told her to "proffer [Gonzales] up because [it] needed him as a witness in a

2001 he represented Perez on several misdemeanor drug charges resulting in the forfeiture of cash. Trial counsel testified Lucy Santana, Gonzales's mother and "Perez's close personal friend," did all the consulting with him regarding Perez's charges because "Perez could not himself [go] into the office because he worked every day and he did not speak very much English." Santana also paid trial counsel's fee for representing Perez.

Trial counsel testified that in January 2002, Santana paid him $25,000 to represent Gonzales in the marijuana trafficking action. Trial counsel stated that in April 2002, Perez was arrested for the same crime, trafficking more than one thousand pounds of marijuana.[3] Trial counsel stated he visited Perez in jail and thereafter agreed to represent him on his trafficking in marijuana charges while simultaneously representing Gonzales. Trial counsel testified his notes indicated Santana again made arrangements to pay his $25,000 fee for representing Perez on the matter.

Trial counsel testified that in June 2002 he was asked to represent Gonzales in the methamphetamine action. He testified Perez paid $3,220 of the $25,000 fee. Trial counsel explained he and Perez reached an agreement whereby trial counsel would take a portion of the money he had recovered for Perez in the 2001 action as part of his fee for representing Gonzales in his pending methamphetamine action. Trial counsel stated the remaining balance was paid by a check from J & M Contractors (J & M). Trial counsel was unsure if J & M was the employer of Gonzales, Santana, or Perez but stated he thought J & M was one of their employers.

Trial counsel contended he did not know Santana, Perez, and Gonzales were family at the time Perez paid a portion of Gonzales's fees. However, he acknowledged he did not know

---

pending prosecution of [Perez]." The district court then appointed Shurling as Gonzales's counsel on a material witness warrant. Subsequently, the trial court appointed her at her request to represent Gonzales on the outstanding marijuana charge, after which she agreed to represent Gonzales in this PCR action.

3. The appendix does not include the indictment for Gonzales's trafficking in marijuana charges or the exact amount of marijuana Gonzales was charged with trafficking. Gonzales refers to the charges as "trafficking large quantities of marijuana."

what relationship Perez had with Gonzales that would make Perez inclined to pay part of the fee for Gonzales's defense. Trial counsel testified, "I was aware, at the time that I began representing . . . Gonzales on the methamphetamine charges, that . . . Santana was his mother[ and] that . . . Perez was either . . . Santana's boyfriend or friend or ex-boyfriend or friend. I—that was the extent of my knowledge about their personal relationships." He further explained,

> I somehow want to think that at some point in time . . . Santana told me that . . . Perez was either her boyfriend or her friend, and I want to think—my, my impression was they had some kind of romantic relationship, but I mean I didn't, maybe I should [have], I didn't see any need to go into vast detail with . . . Santana about the, her personal relationship with . . . Perez.

Trial counsel stated he did not initially consult with Gonzales or Perez regarding waiving the potential conflict of interest. He stated, "[A]s plain as I can put it, I—if a conflict existed, either actual or potential, I did not recognize it at that time." When asked if he recalled ever speaking with Gonzales about his relationship with Perez, trial counsel responded,

> I don't specifically recall asking . . . Gonzales ["]are you in a drug conspiracy with . . . Perez[?"] I, I didn't have any reason to ask that. And you know, I have to just say again, if a potential or actual conflict existed, I, I did not appreciate it. I failed to, to, to apprehend that fact. I—that's all I can say. I . . . didn't see any reason to go to my client and, and, and interview him on the subject of who are you in a drug conspiracy with.

When asked if he ever thought to investigate the connection between Perez and Gonzales given that (1) Gonzales was only seventeen at the time of his charges; (2) Gonzales and Perez were both charged with the same crime—trafficking in a large quantity of marijuana within the same small geographical region—within a relatively short period of time; and (3) trial counsel's attorney's fees for representing Perez and Gonzales were being paid by either Perez or Santana or both, trial counsel explained,

> No, I, I—maybe I should [have]. Although I can say, at the time, given everything that I knew, the only thing I knew

that ... Gonzales and ... Perez had in common was ... Santana. It, it is not uncommon, at least in my experience not uncommon, that individuals that are related to one another or friends with one another, whatever degree of personal relationship they, they have, often wind up in trouble and, and often in the same kind of trouble, but that doesn't mean it's the same trouble.

Trial counsel also testified his dual representation did not have any effect on his representation of Gonzales at trial. He stated he "tried the cases just as hard and the same way [he] would have no matter who [he] represented otherwise."

Trial counsel testified Perez's trafficking in marijuana charges were originally pending in state court but because of the nature of the charges were subsequently taken over by the federal government and became the subject of a federal prosecution. Trial counsel testified

I was not aware of [and] did not appreciate, if any existed, any connection to and was never told directly in anyway prior to the trial of ... Gonzales on methamphetamine trafficking charges that there was any connection at all between ... Gonzales's marijuana trafficking case and ... Perez's marijuana trafficking case. . . . I was led to believe it was two totally separate unrelated occurrences[ by] the discovery in the case. . . .

Trial counsel further asserted, "I had no information whatsoever, no inkling whatsoever, and was never given any information by the government or anybody else that led me to believe that there was any connection whatsoever [between the two marijuana trafficking cases]."

Trial counsel testified he did not recall law enforcement ever consulting him about the possibility of having Gonzales testify against Perez in exchange for a lesser sentence or negotiating a plea. Further, he stated Gonzales did not discuss with him information concerning Perez that may have been valuable in plea negotiations. Trial counsel stated that after trial, Gonzales actually denied having information about Perez. Trial counsel stated,

[A]fter consultation with several experts in the field, I went with [an associate to visit Gonzales] and asked him the question directly and told him he need not do anything

other than tell me the truth, and he denied that there was any connection, and denied it in the context of saying I've always, I've never had any, anything to do with ... Perez.

Trial counsel further testified if he had believed Gonzales had information that "could [have been] useful to [Gonzales's] case if presented to the State for a cooperation deal ... [he] would [have] acted on [that information]" even if it required him to withdraw from the case due to a conflict of interest. He confirmed it is common practice for defense attorneys to pursue plea bargains in cases in which one defendant may be able to provide information to the prosecution concerning "people higher up in the food chain." However, he stated if the possibility of a plea bargain in exchange for information existed in this case, he "did not appreciate the fact that it did." He explained,

> [I]t would not be my general practice to, in every drug case I have, go to law enforcement and say hey, if my client can provide information, will you give him a deal. I, I—if I have a client who is maintaining his innocence and if I have a client [who has] given me no inkling whatsoever that he has any information to give or any willingness to provide whatever information he may have, I, I do not stand on a client to, to say look, you've got to give it up, you've got to give up the information.... [I]f a client though gives me reason to believe that he's willing to do that and some do, or if there's anything about a case that, that alerts me to the, the fact that there may be some substantial benefit to be gained, I wouldn't hesitate to broach that subject with law enforcement or a prosecutor.

Additionally, trial counsel testified Gonzales maintained his innocence and never wanted to plead guilty to any of his pending charges. Trial counsel stated,

> I think what it was, and it's understandable to me, ... a young man facing 30 years in prison would do anything that, that he thought he could, right or wrong, to help himself. But he was not willing to [cooperate with authorities and give information] and never had given any indication to me or anybody else that he was willing to do that prior to his trial. As a matter of fact, the only thing he told me about that situation was that he was not guilty.

Trial counsel testified that in 2003, the USAO informed him it intended to disqualify him as Perez's attorney due to the conflict of interest. According to trial counsel, the USAO also planned to call trial counsel as a witness or potential witness in the government's case against Perez because the government theorized Perez and Gonzales were co-conspirators in a marijuana trafficking conspiracy. Trial counsel testified, "[T]he conflict that was directly alleged by the federal government was a conflict that they themselves alleged developed as a result of [Gonzales's] debriefing after his imprisonment for methamphetamine charges."

Trial counsel stated he withdrew from Perez's case after consulting with ethics experts, knowledgeable attorneys, experienced attorneys with the National Association of Criminal Defense Lawyers, experienced attorneys with the state association of criminal defense lawyers, and his clients. After withdrawing, trial counsel was informed Gonzales had given statements against Perez to federal authorities. A DEA form [4], summarizing a prison interview with Gonzales given May 29, 2003, was entered into evidence at the PCR hearing over the State's objection.

Trial counsel testified that after he learned the federal government thought there was a connection between Gonzales and Perez, he visited Gonzales in jail and asked him to sign a waiver after full disclosure of the conflict of interest. Trial counsel testified that during the visit, Gonzales denied any connection or dealings with Perez but did not sign the form because he wanted to think about it. Trial counsel testified Perez also denied any connection to Gonzales and "[a]cted like he didn't know what [trial counsel] was talking about." An attorney who accompanied trial counsel during the jail visit with Gonzales testified Gonzales "was adamant that there was no connection of any shape or form between [Perez and him], that he knew nothing about Perez's involvement in any criminal activity, and they just . . . traveled in different circles." In

---

4. The parties never articulate what they are referring to when they discuss the "DEA 6" form. Presumably, in this context, DEA refers to the Federal Drug Enforcement Administration. Shurling indicated the DEA 6 form is a transcript or written report of an interview. She stated it is "a shorthand form [and] DEA statement[ ]s are referred to as DEA 6's."

2004, trial counsel moved to withdraw from Gonzales's marijuana trafficking case, citing "an irreconcilable conflict of interest so as to preclude his further representation."

A former federal prosecutor who handled Perez's prosecution testified Shurling was eventually able to solicit Gonzales's cooperation in Perez's prosecution. The former prosecutor testified that after meeting with Shurling, Gonzales gave extensive debriefings to various federal agencies concerning Perez's drug organizations. He indicated a potential benefit of providing information that is substantially beneficial in a federal prosecution includes a "motion for downward departure at the time of sentencing [or a] motion for a reduction in their sentence" if the informant has already been sentenced. The former prosecutor further testified federal prosecutors could have appealed to the local authorities and recommended Gonzales receive favorable treatment in the plea bargaining process as a result of his extensive cooperation. He testified that in his experience, defense attorneys encouraged their clients to provide any information with which they had to barter during the plea negotiation process. Regarding whether a conflict of interest existed in Gonzales's case, the former prosecutor testified, "[B]ased on [the USAO's] view of the case, it was apparent ... there was, at the very least, a potential conflict and possibly a real conflict in [trial counsel] representing both ... Perez and ... Gonzales" and as a result the USAO asked trial counsel to remove himself from the case.

Gonzales testified Perez was dating and living with his mother in 2002. Gonzales stated he met Perez when he was about thirteen years old, Perez was a father figure for him, and Perez got him involved in the drug business. He testified he was delivering the narcotics to Perez on the night he was arrested for trafficking marijuana. He stated his mother and Perez then used Perez's money to hire trial counsel to represent him on the charges. He testified that at that time, trial counsel did not discuss any potential conflicts of interest or ask him to sign any waivers. He testified Perez also hired and paid trial counsel to represent him on the methamphetamine charges. Gonzales asserted that after Perez was arrested for trafficking marijuana, Gonzales asked trial counsel if anything could be done to negotiate a better deal because he

had information to use against Perez. Gonzales stated trial counsel responded, "he couldn't hear this."

Gonzales testified that if trial counsel would have "from the beginning, told [him] that [he] might be able to get a good deal for [himself] if [he] agreed to cooperate with the state and federal authorities and tell them everything [he] knew about the drug business," he would have cooperated. He asserted he would have wanted a different lawyer had trial counsel indicated there could be a problem representing both him and Perez.

Gonzales testified Shurling encouraged him to fully cooperate with state and local authorities by telling them everything he knew about the drug business. Gonzales testified Shurling also advised him to convince his mother to leave Perez and cooperate with federal and state authorities. Further, Gonzales testified he was "[v]ery afraid of . . . Perez" and believed he was "extremely violent and a dangerous man."

Finally, a lieutenant from the narcotics unit of the Spartanburg County Sheriff's Department (the Department) testified regarding the value of cooperating witnesses in narcotics investigations. The lieutenant explained cooperating witnesses are "one of the most important tools that [the narcotics unit] use[s]. [Informants] . . . are very valuable when it comes to investigating cases." He testified one lawyer would not normally represent two individuals involved in a drug case. He testified the dual representation would "hamper [the State's] ability to secure the cooperation from a player in a given scenario if the lawyer was also representing one of the higher-ups in the drug organization." The lieutenant testified both the narcotics and homicide divisions of the Department were interested in "turning" Gonzales as a State's witness against Perez and trial counsel's representation of Gonzales and Perez hampered the State's ability to secure Gonzales as a witness. He testified young people are particularly difficult in criminal prosecutions when charged with serious crimes. He explained that in his experience, young people are generally fearful and "their mothers [and] fathers kind of . . . interfere[ ] with law enforcement. Not, not wanting them to come forward. . . . [M]inors are definitely a problem when it comes to sitting down [and] actually interviewing them. . . ." He

stated in this case it was critical for Gonzales to have his own attorney given Gonzales's age and Perez's status as *in loco parentis* at the time of Gonzales's charges.

Additionally, the lieutenant testified the information Gonzales provided to the Department after trial counsel was relieved and Gonzales was represented by Shurling was "very good reliable information that was corroborated through different outsourcing." He stated based on that information, his office would have been willing to go to the State's office on Gonzales's behalf to attempt to get Gonzales a deal.

The PCR court found Gonzales failed to prove trial counsel had a conflict of interest during Gonzales's trial for trafficking in methamphetamine. Specifically, the PCR court found Gonzales, Perez, and Santana did not tell trial counsel the marijuana cases were related or that Gonzales and Perez were involved with each other's charges. Additionally, the PCR court found trial counsel's testimony was credible and Gonzales's testimony was not credible with regard to the alleged conflict of interest. The PCR court found, "Although [trial] [c]ounsel acknowledged that he was first hired to represent [Gonzales] against charges of trafficking in marijuana, the trial for trafficking in methamphetamine was called first and is ultimately the only charge [Gonzales] proceeded on with [trial] [c]ounsel." Therefore, the PCR court found no conflict of interest existed because Gonzales's charges at the time were unrelated to any charges Perez faced, Gonzales denied knowledge of Perez's drug involvement, and there were no adverse interests. The PCR court also noted Gonzales and Perez were not named as coconspirators or codefendants in any discovery obtained by trial counsel. Accordingly, the PCR court denied the PCR application and dismissed the action with prejudice. Gonzales filed a Rule 59(e), SCRCP, motion to alter or amend, which the PCR court denied. Gonzales petitioned for a writ of certiorari, which this court granted.

**STANDARD OF REVIEW**

■■■ "This [c]ourt gives great deference to the PCR court's findings of fact and conclusions of law." *Miller v. State*, 379 S.C. 108, 115, 665 S.E.2d 596, 599 (2008). The existence in the appendix of any evidence of probative value is sufficient to uphold the PCR court's ruling. *Caprood v. State*,

338 S.C. 103, 109–10, 525 S.E.2d 514, 517 (2000). "This [c]ourt ... will reverse the decision of the PCR court when it is controlled by an error of law." *Goins v. State,* 397 S.C. 568, 573, 726 S.E.2d 1, 3 (2012) (internal quotation marks omitted). If matters of credibility are involved, then this court gives deference to the PCR court's findings because this court lacks the opportunity to directly observe the witnesses. *Foye v. State,* 335 S.C. 586, 589, 518 S.E.2d 265, 267 (1999).

## LAW/ANALYSIS

Gonzales argues the PCR court erred because it found trial counsel was not ineffective for continuing to represent Gonzales despite a conflict of interest. We disagree.

Counsel must provide "reasonably effective assistance" under "prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Reviewing courts presume counsel was effective. *Id.* at 690, 104 S.Ct. 2052. Therefore, to receive relief, the petitioner must show (1) counsel departed from professional norms resulting in (2) prejudice. *Id.* at 690, 693, 104 S.Ct. 2052. "The defendant must first demonstrate that counsel was deficient and then must also show this deficiency resulted in prejudice. To satisfy the first prong, a defendant must show counsel's performance fell below an objective standard of reasonableness." *Goins v. State,* 397 S.C. 568, 573, 726 S.E.2d 1, 3 (2012) (citation and internal quotation marks omitted). Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. 2052.

"The first essential element of effective assistance of counsel is counsel's ability and willingness to advocate fearlessly and effectively on behalf of his client." *Derrington v. United States,* 681 A.2d 1125, 1133 (D.C.1996) (internal quotation marks omitted). "[A] defendant may not be represented by counsel who might be tempted to dampen the ardor

of his defense in order to placate his other client. This possibility is sufficient to constitute an actual conflict as a matter of law." *State v. Gregory*, 364 S.C. 150, 153, 612 S.E.2d 449, 450–51 (2005) (alteration, emphasis, and internal quotation marks omitted). "The danger of an attorney's conflict of interest is that the attorney may forego efforts he would ordinarily undertake on behalf of one client, in order that the other client may not thereby be harmed." *Derrington*, 681 A.2d at 1133 (internal quotation marks omitted). "An attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial. . . . [D]efense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem." *Holloway v. Arkansas*, 435 U.S. 475, 485–86, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (citation and internal quotation marks omitted).

[A]n actual conflict of interest occurs[ ] when a defense attorney places himself in a situation inherently conducive to divided loyalties. If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

*Duncan v. State*, 281 S.C. 435, 438, 315 S.E.2d 809, 811 (1984) (alterations and internal quotation marks omitted); *see also Staggs v. State*, 372 S.C. 549, 551, 643 S.E.2d 690, 692 (2007) ("An actual conflict of interest occurs where an attorney owes a duty to a party whose interests are adverse to the defendant's.").

 In a PCR proceeding, the applicant who claims his or her attorney had a conflict of interest bears the burden of demonstrating he or she is entitled to relief. *Jordan v. State*, 406 S.C. 443, 449, 752 S.E.2d 538, 541 (2013). "Until [an applicant] shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for a claim of ineffective assistance of counsel arising from multiple representation." *Langford v. State*, 310 S.C. 357, 359, 426 S.E.2d 793, 795 (1993). The mere possibility of

494

"a conflict of interest is insufficient to impugn a criminal conviction." *Lomax v. State,* 379 S.C. 93, 101, 665 S.E.2d 164, 168 (2008). "While unconstitutional multiple representation is never harmless error, multiple representation standing alone is not violative of the Sixth Amendment." *Vance v. State,* 275 S.C. 162, 163, 268 S.E.2d 275, 275 (1980) (citation omitted). Additionally, "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986).

"To establish a violation of the Sixth Amendment right to effective counsel due to a conflict of interest arising from multiple representation, a defendant who did not object at trial must show an actual conflict of interest *adversely affected his attorney's performance." Thomas v. State,* 346 S.C. 140, 143, 551 S.E.2d 254, 256 (2001) (emphasis added).

When an actual conflict of interest exists,

[C]ounsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.... Prejudice is presumed *only* if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest *adversely affected his lawyer's performance.*

*Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 (emphases added) (citation and internal quotation marks omitted); *see also State v. Sterling,* 377 S.C. 475, 480, 661 S.E.2d 99, 101 (2008) (holding prejudice is presumed when an actual conflict *adversely affects* pretrial strategies as well as the defense at trial). "[A] defendant must establish that an actual conflict of interest *adversely affected his lawyer's performance." Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (emphasis added). "The *Sullivan* standard requires a showing that (1) petitioner's lawyer operated under a conflict of interest and (2) *such conflict adversely affected his lawyer's*

*performance.* If the petitioner makes this showing, prejudice is presumed and nothing more is required for relief." *United States v. Nicholson,* 611 F.3d 191, 205 (4th Cir.2010) (emphasis added) (citation and internal quotation marks omitted).

In order to prevail on a conflict claim, a habeas petitioner must establish, under the second prong of *Cuyler,* that the actual conflict of interest *compromised his attorney's representation.* This occurs when an attorney takes action for one client that is necessarily adverse to another, or when an attorney fails to take action for one client for fear of injuring another. In analyzing this issue, we use the three-factor test described in *Mickens v. Taylor[,* 240 F.3d 348, 361 (4th Cir.2001), aff'd, 535 U.S. 162 [122 S.Ct. 1237, 152 L.Ed.2d 291] (2002) ]:

First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued. Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision. [To demonstrate objective reasonableness,] the petitioner must show that the alternative strategy or tactic was clearly suggested by the circumstances. Finally, the petitioner must establish that *the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.*

*Stephens v. Branker,* 570 F.3d 198, 209 (4th Cir.2009) (second alteration by court) (emphases added) (citation and internal quotation marks omitted).

A defendant has established an adverse effect if he proves that his attorney took action on behalf of one client that was necessarily adverse to the defense of another or failed to take action on behalf of one because it would adversely affect another. Thus, both taking action and failing to take actions that are clearly suggested by the circumstances can indicate an adverse effect. An adverse effect can arise at any stage of the litigation including pretrial investigation or entry of a plea.

*Mickens,* 240 F.3d at 360 (citations and internal quotation marks omitted).

Gonzales cites *Derrington*, 681 A.2d at 1127–38, in support of his petition and contends the two cases have very similar facts. The *Derrington* court held the petitioner was denied effective assistance due to a conflict because his attorney had another client charged with a crime about which the petitioner might have had information. *Id.* at 1130, 1138. Trial counsel contended although he initially sought to withdraw from representing the petitioner, he investigated once the petitioner was named and determined he was not an informant on the case. *Id.* at 1127–28, 1130.

However, trial counsel learned of a possible conflict before the petitioner's trial when the petitioner was mentioned as an informant during the trial of another of trial counsel's clients. *Id.* at 1127, 1130. Although the petitioner initially denied he had information, he acknowledged otherwise to trial counsel before his trial began. *Id.* at 1138. Additionally, the prosecutor confirmed the petitioner was a source. *Id.*

In a recent conflict of interest case from our supreme court, the court found:

At the PCR hearing, [trial counsel] testified that he was introduced to, and came to represent, Petitioner by way of Summers. [Trial counsel] was actively representing Summers. While Summers was not charged in relation to this methamphetamine seizure, she was the initial focus of law enforcement's investigation. In fact, the investigation was initiated only upon officers' receipt of a tip naming Summers as the individual manufacturing methamphetamine. Moreover, at trial, the evidence of Summers' guilt was such that the trial judge permitted [trial counsel] to proceed on a theory of Summers' third-party guilt, but [trial counsel] never pursued this theory. [Trial counsel] testified at the PCR hearing that he "was trying to throw mud any place [he] could that it would stick." That testimony is fundamentally at odds with [trial counsel's] failure to pursue a third-party guilt defense as to Summers.

We find as a matter of law that [trial counsel's] concurrent representation of Petitioner and Summers constituted an actual conflict of interest. The effect of this actual conflict of interest is best illustrated by [trial counsel's] refusal to pursue a third-party guilt defense as to Summers, especially

after being invited by the trial judge to do so. Because of the actual conflict of interest, Petitioner was not required to demonstrate resulting prejudice.

*Jordan,* 406 S.C. at 450, 752 S.E.2d at 541 (fourth from last alteration by court).

■■ In the present case, several incidents occurred between January 2002, when trial counsel began representing Gonzales, and July 2002, when the trial court sentenced Gonzales in the methamphetamine action, that should have led a reasonable attorney to question the existence of a conflict of interest in representing both Perez and Gonzales and take action to resolve the conflict. Specifically, those facts include (1) trial counsel knew or should have known of the familial relationship between Perez and Gonzales[5]; (2) Gonzales was seventeen at the time of the charges, indicating his drug involvement could have been associated with an older role model such as Perez; (3) within a few months both Perez and Gonzales were charged with trafficking a very large quantity of marijuana in the same small geographical location; (4) either Perez or Gonzales's mother, Santana, was paying trial counsel's substantial attorney's fees for representing Perez and Gonzales, indicating a connection between the individuals; and (5) trial counsel and Perez agreed trial counsel would apply towards trial counsel's fees for representing Gonzales the funds he recovered for Perez in the forfeiture action involving drug charges. Despite receiving this information, trial counsel did not consult with Gonzales or Perez as to their connection or whether either party wished to waive any potential conflict of interest before Gonzales's trafficking in methamphetamine trial. Trial counsel simply remarked, "[I]f a conflict existed, either actual or potential, I did not recognize it at that time."

---

**5.** Trial counsel stated:

I somehow want to think that at some point in time . . . Santana told me that . . . Perez was either her boyfriend or her friend, and I want to think—my, my impression was they had some kind of romantic relationship, but I mean I didn't, maybe I should [have], I didn't see any need to go into vast detail with . . . Santana about the, her personal relationship with . . . Perez.

Additionally, codefendant's counsel referred to Perez as Gonzales's "stepfather" during trial and an investigating officer acknowledged Gonzales's family's drug business.

However, Gonzales has not shown the conflict of interest adversely affected trial counsel's performance due to the PCR court's credibility findings. The PCR court found trial counsel credible and Gonzales was not credible. Throughout the PCR hearing, trial counsel remained adamant he was not aware of the familial connection between Perez and Gonzales, did not know their trafficking in marijuana charges were related, and did not know Gonzales wanted to provide information against Perez in order to gain bargaining power in plea negotiations. Additionally, trial counsel indicated Gonzales unwaveringly denied any involvement in or having any information about Perez's charges when he met with Gonzales after trial. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Although an actual conflict existed, because trial counsel did not recognize the conflict, Gonzales cannot demonstrate the conflict affected trial counsel's performance.

We are troubled by trial counsel's failure to recognize the interests of Gonzales and Perez were sufficiently adverse because trial counsel had a duty to Gonzales to use information Gonzales could have provided against Perez in Perez's marijuana action, which would have been detrimental to Perez. *See Duncan*, 281 S.C. at 438, 315 S.E.2d at 811 ("The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client."). Although Gonzales's trafficking in methamphetamine charges proceeded to trial before Gonzales's trafficking in marijuana charge, trial counsel represented Perez and Gonzales on their respective trafficking in marijuana charges for several months prior to Gonzales's trial. *See Sterling*, 377 S.C. at 480, 661 S.E.2d at 101 (noting a defendant suffered a Sixth Amendment violation when counsel acted under a conflict of interest from the pre-indictment stage until the conclusion of the defendant's trial).

Additionally, at the PCR hearing, Gonzales contended that before trial, he told trial counsel he had information to use as an informant against Perez in Perez's trafficking case. Gon-

zales asserted he asked trial counsel if that information could be used as a bargaining tool to lessen his sentence or potentially lead to a plea deal in his trafficking in methamphetamine action. Gonzales testified trial counsel replied, "I can't hear [that]," indicating that at that time trial counsel also owed a duty to Perez, whose interests were adverse to Gonzales's. *See Thomas*, 346 S.C. at 144, 551 S.E.2d at 256 ("Although petitioner initially waived a conflict of interest, once it became clear an actual conflict existed due to [a] plea bargain, counsel should have either withdrawn from representing one or both of them or acquired another waiver covering this specific conflict."). However, Gonzales admitted he later denied to trial counsel he could have provided information against Perez. The PCR court found Gonzales uncredible, and we must defer to the PCR court's findings on credibility matters. *See Foye v. State*, 335 S.C. 586, 589, 518 S.E.2d 265, 267 (1999) (stating if matters of credibility are involved, this court gives deference to the PCR court's findings because this court lacks the opportunity to directly observe the witnesses); *see also Hyman v. State*, 397 S.C. 35, 45, 723 S.E.2d 375, 380 (2012) (stating the appellate court's deference to the PCR court's credibility findings is so great that it required the court to uphold the PCR court's determination even when the trial record unequivocally contradicted the testimony at the PCR hearing).

We also note that throughout trial, trial counsel portrayed Gonzales as a "very young person" unable to make responsible decisions.[6] Likewise, the Department Lieutenant testified

---

**6.** At trial, trial counsel repeatedly remarked to the jury Gonzales was a "very young person." After the State's case and during an *in camera* proceeding, Gonzales's codefendant examined an investigating officer as follows:

[Codefendant]: [D]o you have prior knowledge of . . . Gonzales prior to this case?
[Officer]: Yes, sir, I do.
. . . .
[Codefendant]: And do you know him to be a marijuana drug dealer by prior arrests?
[Officer:] Yes, sir.
. . . .
[Codefendant]: Would you classify
[Gonzales's] business—or excuse me, his family as a *drug dealing family?*

regarding the difficulty in working with young offenders such as Gonzales and their fearfulness when involved in serious crimes. *See Graham v. Florida*, 560 U.S. 48, 78, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (noting the features distinguishing juveniles from adults that put young defendants at a significant disadvantage in criminal proceedings: "[Young defendants] mistrust adults and have limited understandings of the criminal justice system and the roles of the institutional actors within it. They are less likely than adults to work effectively with their lawyers to aid in their defense. Difficulty in weighing long-term consequences; a corresponding impulsiveness; and reluctance to trust defense counsel seen as part of the adult world a rebellious youth rejects, all can lead to poor decisions by [the young person]." (citations omitted)). Given Gonzales's age and relationship to Perez, there are several reasons why he would have later denied having information to trial counsel after initially telling trial counsel he had the information. *See Wood v. Georgia*, 450 U.S. 261, 268–69, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (noting "the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise"); *Derrington*, 681 A.2d at 1138 (rejecting the contention counsel's representation of the other party did not adversely affect counsel's performance in petitioner's case because the petitioner denied being an informant in the other party's case and reasoning that "one predictable consequence of [counsel's] representation of the [other party], and [petitioner's] knowledge of that representation, would be to inhibit [petitioner] from being candid with [counsel], especially regarding [petitioner's] activities as an informant, for fear of reprisal from the [other party]"). Additionally, at trial, an investigating officer connected Gonzales's and Perez's marijuana charges,

---

[Officer]: I don't really know his mother.
[Codefendant]: Do you know his *stepfather* ... Perez?
[Officer]: Yes, sir.
[Codefendant]: Has [Perez] been arrested—
[Officer]: Yes, sir, he has.
[Codefendant]:—to your knowledge[?] And what for?
[Officer]: Marijuana. Trafficking in marijuana.
(emphasis added).

acknowledged Perez as Gonzales's stepfather, and indicated the family was a "drug dealing family."

Once he had new representation, Gonzales eventually provided information against Perez to state and federal authorities as part of plea negotiations and pled guilty to the trafficking in marijuana charges pursuant to the plea deal. A DEA representative testified Gonzales was "extremely cooperative" with federal authorities. A Department representative testified Gonzales ultimately provided to the narcotics unit "very good reliable information that was corroborated through different outsourcing." The representative testified based on that information, his office would have been willing to go to the State on Gonzales's behalf to attempt to get Gonzales a better deal in his methamphetamine charge. Moreover, trial counsel eventually acknowledged the conflict and withdrew from Perez's marijuana trafficking at the recommendation of the USAO. Trial counsel also eventually withdrew from Gonzales's marijuana trafficking action in 2004, conceding "an irreconcilable conflict of interest ... preclude[d] his further representation."

Based on all of this, counsel should have recognized the conflict and even if he did not, the conflict could have made Gonzales less inclined to tell trial counsel he had information about Perez. However, all of the case law indicates the conflict must have adversely affected trial counsel's performance. Gonzales cannot show this without showing trial counsel recognized the conflict. Because we are bound by the PCR court's finding trial counsel's testimony credible that he did not recognize the conflict, we must find trial counsel's conflict did not adversely affect his performance. Although Shurling later procured a deal for Gonzales on another charge in turn for his testimony against Perez, because trial counsel did not know of the conflict, we cannot find the conflict was the reason he did not pursue a deal in the methamphetamine trafficking case in return for information about Perez.

The present case differs from most of the South Carolina cases on conflict of interest because those cases involved codefendants. *See Lomax*, 379 S.C. at 97, 103, 665 S.E.2d at 166, 169 (holding the PCR court erred in failing to find a conflict of interest existed when plea counsel simultaneously represented both the petitioner and her husband during guilty

pleas that arose out of related offenses) (citing *Thomas*, 346 S.C. at 143–45, 551 S.E.2d at 256 (holding the petitioner in PCR proceeding demonstrated actual conflict of interest that affected her counsel's performance given counsel jointly represented the petitioner and her husband in a case in which solicitor offered a plea bargain that would allow the charge against one spouse to be dismissed if the other spouse would plead guilty to the entire amount of cocaine); *Staggs*, 372 S.C. at 551–52, 643 S.E.2d at 691–92 (holding the petitioner in PCR proceeding demonstrated an actual conflict of interest that adversely affected counsel's trial performance when his counsel, who represented him on the charge of murder, also simultaneously represented the petitioner's father, mother, and brother on related accessory after the fact of murder charges); Allan L. Schwartz, *Circumstances Giving Rise to Conflict of Interest Between or Among Criminal Codefendants Precluding Representation by Same Counsel*, 34 A.L.R.3d 470 (1970 & Supp.2008) (outlining cases that consider what particular circumstances give rise to conflict of interest when a single counsel represents multiple codefendants)).

This case also differs from *Jordan*, 406 S.C. at 450, 752 S.E.2d at 541. Although the petitioner's girlfriend in *Jordan* was not a codefendant, "she was the initial focus of law enforcement's investigation" and at trial, the evidence of her guilt was such that the trial court permitted trial counsel to proceed on a theory of her third-party guilt, but trial counsel never pursued this theory. *Id.* This case also is distinguishable from *Derrington* because in that case, trial counsel did not dispute he knew the petitioner was named as an informant in the case against his other client. *See* 681 A.2d at 1134 ("The first prong of the *Cuyler* test requires [the petitioner] to establish that [trial counsel] had an actual conflict of interest during the time that he served as [the petitioner's] trial attorney. [The petitioner's] task is made substantially easier by the fact that [trial counsel] himself identified the conflict at the initial status hearing . . . .").

Because Gonzales has not shown trial counsel's conflict adversely affected counsel's performance, he has not shown prejudice. Accordingly, the PCR court's denial of PCR is

**AFFIRMED.**

HUFF, J., concurs.

SHORT, J.

I respectfully dissent. I find Gonzales has shown the conflict of interest adversely affected trial counsel's representation. Although I find credible trial counsel's testimony that he zealously represented Gonzales, I find his failure to timely recognize the conflict of interest adversely affected his performance. Trial counsel portrayed Gonzales as a "very young person" unable to make responsible decisions, which should have more timely heightened counsel's awareness to the possibility of a conflict of interest. In light of the government officials' testimony of the far more favorable treatment Gonzales could have obtained, I find the conflict of interest adversely affected trial counsel's performance.